W. L. HALL, Administrator, v. EMMA TURNER, Administratrix.

*Easement—Estate, Base or Qualified, and upon Condition—Mills and Dams—Contract, Construction of—Evidence.*

In 1873, H. and T. entered into an agreement under seal, by which H. "Consents for said T. to back water, if necessary, up into his field, on condition that said T. will allow H. as much woodland along the line fence on south side of the river; T. is allowed to raise dam eight or nine feet high; this agreement to remain good so long as T. keeps up a mill; * * * afterwards to be null and void." T. erected a mill and dam, in consequence of which about twelve acres of H.'s land were eventually flooded, and H. went into possession of about four or five acres of the woodland, that being about the quantity covered originally by the water of the pond: *Held*—

1. The agreement vested in T. an equitable base, or qualified fee, in an easement to back the water upon H.'s land so long as he, or those claiming under him, maintained the mill, and that upon T.'s death, this estate descended to his heirs. (Base, or qualified fees defined, and *Hill v. Kesler*, 67 N. C., 443, commented upon.)

2. The agreement that H. should have as much land on the south side of the river was a condition subsequent to the easement so created, and upon the failure of T., or those claiming under him, to perform that condition, the easement terminates.

3. That H.'s right to occupy the land under the condition subsequent, was not restricted to the amount which he entered upon at the beginning of the operation of the agreement, but expanded and was co-extensive with the quantity of land which subsequently became servient to the overflow of his land from the erection of the dam.

4. That H. was entitled, under the agreement, to the use of so much of T.'s land as T., by the erection of the dam not only actually over-flowed, but "sobbed" and made unfit for cultivation, of his (H.'s) land

5. The evidence as to the height of the dam being conflicting, the Court properly charged the jury that by a dam nine feet high is meant such a dam as, under given circumstances, will pond the same quantity of water that a dam exactly and uniformly nine feet high under same circumstances would pond.

This was a CIVIL ACTION, tried before *Winston, J*, at August Term, 1891, of ORANGE Superior Court.

The plaintiffs, the administrator, widow and heirs at law of Lambert Hall, allege that the said Lambert Hall and Evans Turner on the 13th of March, 1873, entered into the following agreement, to-wit:

"Articles of agreement made and entered into, this the 13th day of March, 1873, between L. W. Hall of the county of Orange and State of North Carolina, of the one part, and Evans Turner of the county and State aforesaid, of the other part, witnesseth, that the said L. W. Hall agrees and consents for the said Evans Turner to back water if necessary up into his field, on condition that said Evans Turner will allow the said L. W. Hall as much woodland along the line fence on the south of the river. Said Turner is allowed to raise a dam eight or nine feet high. This agreement to remain good so long as the said Turner keeps up a mill at the Wagoner place, afterwards to be null and void. Witness our hands and seals the day and date above written. (Signed) L. W. HALL, (Seal). EVANS TURNER, (Seal). Witness, N. Y. HARRIS.

The complaint further alleges that, at the time of the execution of said agreement, about four or five acres of woodland of said Turner were taken possession of by said Hall, and that he used the same until his death in 1888; that said Turner, after the adoption of the stock law in 1885, hauled off all the fences on said four or five acres, and that the same

were mortgaged in 1882 to one Gray; that the dam raised by Turner is from the bottom of the mudsill to the top of the sheeting, ten feet three inches, and from the mudsill to bottom of the river about two feet, and the land of the plaintiff, which is flooded and damaged by said mill-pond, is about twelve acres, on most of which dower has been assigned to the plaintiff Fannie J. Hall; that the same would be very productive if not damaged by the said flooding; that plaintiffs have not continued in the possession of the four or five acres south of the river since the death of Evans Turner.

They demand judgment—

1. That "the license granted in said agreement" terminated at the death of said Turner in 1889, and is void for uncertainty and indefiniteness, and is no longer operative and binding on the plaintiffs.

2. That if it be considered as running with the land, that the quantity of land damaged be ascertained and the same quantity set apart to the plaintiffs south of the river, if said dam shall not exceed the height allowed in said agreement.

3. That if said dam be found to be more than nine feet high, then they ask that the damages be inquired into and for judgment for the same.

4. That if plaintiffs are compelled to take the land south of the river in lieu of that flooded and damaged, that the defendants be required to free the same from all mortgages and incumbrances existing thereon.

5. That the lands of plaintiffs be freed from said agreement, and the defendants keep the land on the south side of the river.

6. That the dam be pulled down and the plaintiffs be paid all damages done them during the life of said Turner by reason of his violations of said agreement, and since that time by reason of said dam.

7. That all damages up to the time of the trial be assessed.

8. For further and other relief, and for costs.

The defendants, in their answer, admit the execution of said agreement, and that the land on the south of the river, mentioned in the complaint, was taken possession of by Hall; but they allege that the quantity is underestimated, and that the same is equal to that covered by water in consequence of said dam. They deny the removal of the fences. They admit the execution of the mortgage. They deny the raising of the dam to the height alleged by plaintiffs. They deny any damage as alleged, and aver that if there be any it existed and was provided for at the time of the execution of the said agreement by the taking possession of the four acres. They deny that the plaintiff has discontinued the use of said land since the death of Evans Turner. They deny any violation of said agreement by said Turner or themselves, and they claim that said agreement operates as a covenant running with the land.

The following issues were, without objection, submitted to the jury :

1. Has the dam been raised above nine feet? No.

2. If so, what yearly damage have the plaintiffs sustained on account of same?

3. What quantity of land is covered by water ponded back by the dam and damaged thereby?

4 What quantity of land is embraced in the tract agreed to be conveyed by Evans Turner to plaintiffs' intestate. Ans. Four acres (by consent).

R. N. Hall, Jr., testified that he had accurately measured the height of the dam in the summer of 1890, assisted by S. H. Jordan, since dead, and that it averages ten feet high all the way through ; a little lower for a small distance on the south than the rest of the way, and was highest in the centre of the current in the stream ; that the mudsill was raised a foot above the bed of the river, making the actual height of dam from bed of river eleven feet. That the length of the dam is 133 feet eight inches. That the damage to the

land of plaintiff yearly from the raising of the dam above nine feet would be $30. That twelve acres were under water, or sobbed from the ponding back.

H. Y. Harriss also testified to same amount of damage from the dam being above nine feet. That a dam at nine feet would do little damage and not cover more than four or five acres.

C. R. Miller testified that he and R. N. Hall, Jr., had recently measured the height of the dam, and it was about ten feet high, and that the mudsill was one foot above the bed of the river, making the actual height of the dam eleven feet, and that the yearly damage from the erection of a dam above nine feet to land of plaintiff was $30.

Defendant introduced one A. M. Leathers, who testified that the dam was eight feet high, measured by him and others in 1890, in July.

Other witnesses testified as to the benefit of the dam to the land of plaintiff, and that the lands were not damaged by being covered with water in times of freshet, and as to the value of the land, about four acres, which intestate had formerly used belonging to defendant's intestate, and that in the trade the deceased Hall got the better of the deceased Turner. One witness also stated that the land covered by water was not as much as ten acres. Defendant Emma Turner stated she had the dam repaired since the death of Evans Turner, but it had not been raised above what it was before.

Other witnesses stated that they were present when Leathers measured the dam, and saw him measure it in July, 1890. Wm. F. Gray, witness, testified that he assisted A. M. Leathers by putting down the tape line on dam every ten feet, and on paper the figures which he called out, and also stated that the portion of the dam which A. M. Leathers made nine feet five inches high extended for twenty feet in the centre of the stream, but the dam was lower on each side

of this.   That the dam did not average more than seven or eight feet in height.   A. M. Leathers also stated the same. There was also testimony that Evans Turner, in 1885, hauled off the fence around the land.

Counsel for plaintiff, in his argument, contended that the evidence in the case, both for plaintiffs and defendants, showed that a dam had been erected above nine feet, and the admission of the defendants' witnesses that the dam was over nine feet at two different points, one of them extending a distance of twenty feet in the centre of the current, was of itself sufficient to decide the first issue in the affirmative.

His Honor in his charge to the jury stated to them that he did not agree with the argument of the plaintiffs' or defendants' counsel respecting the rule, and charged the jury as follows:

"In this case four issues are submitted to you for your consideration.   It is agreed by counsel for both plaintiffs and defendants, that under the agreement dated 13th March, 1873, between L. W. Hall and Evans Turner, said Evans Turner could erect a mill-dam not exceeding nine feet in height.   So the Court presents to you the first issue, Is the present dam higher than nine feet?   In considering this issue, which is one of fact for you, you will recall all the evidence bearing on the same.

"There is no evidence that the mill-dam at present existing is not of uniform height, and hence the Court gives you the following rule to guide you in determining whether the said dam is over or under nine feet high, to-wit: By a dam nine feet high is meant such a dam as, under given circumstances, will pond the same quantity of water that a dam exactly and uniformly nine feet high, under the same circumstances, would pond.   Exception by plaintiff.

"Therefore, you will ascertain from the evidence whether the dam that now stands ponds back, on account of its increased, but broken height (if you shall find that it has been increased

in height), but not on account of any filling up of the bed of the pond and tightening or improving the dam, except by raising more water, that is, a greater volume of water, than a dam of uniform height of nine feet would do. If so, you will answer the first issue, Yes; otherwise, No.

"If you answer the first issue No, you need not answer the other issues at all. If you answer it Yes, you will next consider what amount of damage the plaintiffs have sustained on account of same.

"If the dam has been increased in height, and such increase has caused damage, the element of damage will be the overflow of the new land and the sobbing of same, and injuring and destroying its value although not overflowed, and you will simply calculate what the annual injury on all of such damage is, and answer the second issue as you shall find. The third and fourth issues are issues of fact unmixed with law, and the Court cannot aid you in determining the same."

His Honor answered the fourth issue "Yes," by consent, and told the jury that if the first issue was answered in the negative they would not proceed to the consideration of the other issues.

The jury returned the response "No" to the first issue, and no answer to the second and third issues. The fourth had been answered by his Honor "Yes," as above stated, before the jury retired.

Plaintiff, after a motion for a new trial, on the ground that the verdict was against the weight of testimony, which was refused, moved to set aside the verdict because there was no response to the third issue, and which was material and closely connected with first issue, in view of the testimony that a dam at nine feet would only cover four or five acres, while there was testimony that twelve acres were covered and sobbed. His Honor declined the motion, and plaintiff excepted.

Plaintiffs' counsel then insisted that even if the dam was only nine feet high, under the contract of 13th March, 1873, the plaintiffs were entitled to "as much woodland along the line fence on the south side of the river" as was covered by backwater, and the failure of the jury to find this amount rendered a new trial necessary. His Honor refused a new trial on this ground, and plaintiffs excepted.

Upon the questions reserved, the plaintiffs then moved for judgment—

1. That as there is no sufficient description by which any quantity of land can be allotted to plaintiffs as compensation for the ponding of water on their land, the said contract of March 13th, 1873, is void for vagueness and uncertainty; and as the consideration to be paid to plaintiffs cannot be ascertained, the said contract should be annulled *non obstante veredicto.*

2. That said contract is but a license to the said Evans Turner, which expired with his death, being personal to him, and not a covenant running with the land. And as there is no provision for a conveyance of any land to L. W. Hall in fee, but only a permissive use to continue as long as "said Turner" keeps up a mill, the said contract had therefore been fulfilled and ended, and the plaintiffs were no longer restrained thereby, but had a right to abrogate the same and have the dam removed.

3. That the said contract was but a license to keep up a mill at the Wagoner place to said Turner, and that if it did not expire with the death of said Turner, the mill must go down by *natural decay*, and could not be repaired by his administrator or heirs at law, and defendants were liable for any flooding caused by such repairs and must remove the dam or pay for the trespass.

4. That said contract should be declared void and impossible of enforcement and entirely annulled, as there is no definite description to identify the land intended to be con-

veyed on either side, or fit it to the description in the paper-writing. And the acts of ownership still exercised by Evans Turner over the four acres in the possession of Lambert Hall, by taking the rails therefrom and including it in the mortgage to Gray, showed that it had not been conveyed, or intended to be conveyed, to Lambert Hall, and was still the property of Evans Turner.

5. That as no consideration has been received other than the permissive use of the four acres, which continually decreased in value while the damage to the land covered and sobbed by water from the ponding continually increased in amount, the said agreement is against equity and good conscience, and a growing hardship, from which the plaintiffs ought to be relieved and restored to the right to recover proper compensation for the injury done their land.

6. That the said agreement was a personal license given by L. W. Hall and expired with his death, and the rights of his widow and heirs at law as owners of the land are not concluded by anything contained in said agreement from insisting that the dam be pulled down or proper compensation made to them.

7. That no title has been passed to the plaintiffs or their ancestors for any land, and there is a fatal vagueness of description which cannot be corrected or made definite, and that the parties should be restored to their original positions, and the paper-writing delivered up and cancelled and declared null and void.

The following judgment was rendered:

"This cause having been heard, and the jury for its verdict having said that the dam has not been raised above nine feet, and the Court being of the opinion that the other issues submitted are not material whether the agreement between the intestates of the plaintiffs and defendants respecting the erection of the dam is a license revocable at the death of Turner, or is void for uncertainty, and the Court

being further of opinion that if.said agreement is a cove-
nant perpetual running with and binding the land, then the
equitable aid of the Court cannot be invoked to ascertain
and set apart to the plaintiffs the same quantity of land as
is covered by water, for that there is neither allegation in the
complaint nor proof that the defendants have ever declined
or refused, or do now decline, to permit the plaintiffs to have,
use, occupy and enjoy the said quantity of land in as full
and ample a manner as the said covenant or agreement
authorizes.    The Court doth therefore adjudge that the
plaintiffs take nothing by their writ, and that defendants go
hence without day and recover their costs."

From this judgment the plaintiffs appealed.

*Mr. J. W. Graham*, for plaintiffs.
*Mr. J. S. Manning*, for defendants.

SHEPHERD, J.—after stating the case proceeded: After a
careful consideration of the charge of his Honor in reference
to the height of the dam, we are of the opinion that, in view
of the testimony, there was no error, and that the exception
of the plaintiff in this particular must be overruled.

The other points presented in the record are not so clear,
and we approach their consideration with no little doubt and
solicitude.    The plaintiffs insist that the right of the defend-
ants to maintain the dam and overflow the plaintiffs' land,
determined at the death of the defendants' ancestor, Evans
Turner; but if they are mistaken in this, they pray that the
defendants, the heirs of said Turner, be required to " allow"
the plaintiffs the use of so much land on the south of the
river as will equal in acreage the quantity now overflowed
and damaged by reason of the maintenance of the said dam.
The agreement between the said Hall and Turner is of a
very peculiar character, and so vague and uncertain in part
that, but for the fact of its having been executed by one of

the parties who has erected permanent improvements, we would be somewhat inclined to place it under that class of contracts mentioned by Lord BROUGHAM in *Keppel* v. *Bailey*, (2 *Mylne* v. *Keene*, 577) as being "so clearly inconvenient to the science of the law" as to receive no encouragement at the hand of the Courts. Although the agreement contains no words of covenant, we think that, in consideration of the circumstances, an equitable construction warrants us in holding that it was the intention of Hall to confer upon Turner an easement "to back water, if necessary, up into his field." Such an easement is "an incorporeal hereditament, a right not indeed to the land itself, but to a privilege on and upon the land. * * * It is a freehold interest," and within the statute of frauds. *Bridges* v. *Percell*, 1 D. & B., 492.

It is true that in *McCracken* v. *McCracken* (88 N. C., 272), it is said that such an interest must not only be evidenced by writing, but that it can "only be made effectual by deed;" but by the use of this language the learned Justice who delivered the opinion was evidently referring to the subject in its legal aspects, as it is well settled that an agreement upon a valuable consideration to confer an easement will be effectuated in equity, provided it be in writing, and this without reference to the presence of a seal. *Railroad* v. *Battle*, 66 N. C., 546; *Railroad* v. *Railroad*, 104 N. C., 658. So too, a covenant, though not technically "running with the land," may nevertheless be sometimes binding in equity to the extent of fastening a servitude upon real property. Pom. Eq., 689; *Duke of Bedford* v. *Trustees*, 2 M. & K., 517.

Such is the character of the agreement before us; but the important question presented, is how long is this easement or servitude to continue? An interest like this, being within the statute of frauds, is created in the same manner as an interest in the land itself, and hence it would seem that if there be a grant of an easement, there must be words of inheritance if it is intended that the estate shall endure

beyond the life of the grantee. So, on the other hand, if there be a contract to confer an easement, it will ordinarily be governed by the same principles as are usually applied to contracts for the sale of real estate. Thus, if one contract to sell land to another, and there be no words of restriction, it is implied that an estate in fee is intended, and specific performance will accordingly be decreed. Likewise, if one agree to confer an easement, and from the nature of the contract and its subject-matter there is nothing to show that it is to be restricted to the life of either party, there is an implication that the grant is to be co-extensive with the uses apparently contemplated by the parties. In our case it is contended that there are words of restriction, to-wit: "This agreement to remain good so long as the said Turner keeps up a mill at the Wagoner place." In opposition to this view, the defendants rely upon the case of *Merriman* v. *Russell*, 2 Jones' Eq., 470. In that case the "articles of agreement" contained no words of inheritance, but simply the following language, viz., "bargained and sold so much of my land lying on Hooper's Creek, in the county and State aforesaid, as will conveniently carry the water to a saw-mill so as to be to his (W. R. Gash's) profit and advantage." The Court speaks of this writing as a grant, and PEARSON, J., in delivering the opinion, said: "There are no words of limitation, and by the rule of the common law in reference to a grant of land, only an estate for the life of the grantee would pass. Here the rule of construction comes in again. As the professed purpose is to convey water to a mill, of course it was the intention that the supply of water should be kept up as long as the party wished to operate the mill. Few would be at the expense of erecting a mill if the supply of water depended upon the uncertainty of life. We think there was a base or qualified fee granted in this easement, and that Gash, his heirs and assigns are entitled to it so long as they continue to operate the mill."

However just may be the criticism upon the resort to construction in the above case and thereby supplying words of inheritance (if, indeed, the instrument was considered simply in its legal character as a grant), it is very clear that the objection cannot be urged in the present instance, where the agreement is entirely executory in its nature. At all events, the case of Merriman (*supra*) lends us valuable aid in solving the question now before us. In that case the easement was in so much of the land "as will conveniently carry the water to a saw-mill so as to be to *his* (W. R. Gash's) *profit and advantage.*" Why should not these words be considered as equally restrictive as those used in the present contract, viz., "This agreement to remain good so long as the said Turner keeps up a mill at the Wagoner place." In one case, the easement is to be to "his (the grantee's) advantage;" in the other, so long as "Turner keeps up a mill," etc. It would seem that the privilege granted was as personal in one case as in the other, but admitting that there is a shade of difference between them, yet this must surely disappear when the contract is viewed in the light of the reasoning of the opinion in the case above mentioned. "Few (says the Court) would be at the expense of erecting a mill if the supply depended upon the uncertainty of life," and so, too, we may remark in this case, that few would erect a mill-dam and other improvements if its enjoyment was to be contingent upon the duration of the life of one of the parties.

In consideration of the foregoing reasons, and in the absence of plain restrictive language, we conclude that it was not the intention of the parties that Turner was to have a mere personal right to flood the land of Hall, but that the easement or servitude descended with the land to the heirs of Turner, who have, *in equity*, a base, qualified or determinable fee therein.

But here we are confronted with the case of *Commissioners* v. *Kesler,* 67 N. C., 413, in which PEARSON, C. J., speaks of a base or qualified fee as an "obsolete estate, which has never been in force or in use in this State." It is impossible to reconcile the conflicting utterances of that distinguished jurist upon this subject. Whenever a fee is so qualified as to be made to determine, or liable to be defeated, upon the happening of some contingent event or act, the fee is said to be base, qualified or determinable. Tiedman R. P., 44. This definition, in a general sense, comprehends a fee upon condition, a fee upon limitation, and a fee conditional at common law. Some authors apply the term *base fee* solely to limitations of the last-named class (Tiedman Real Property, *supra*); and these having been converted into estates tail by the statute *de donis,* and these latter by our statute into fees simple, it would of course follow that if the term "base fee" is exclusively applicable to a fee conditional, as it was technically known at common law, it no longer exists in this State. Blackstone's classification is different (2 vol., 110), and there is some confusion in the ancient authorities upon the subject. Practically, however, in modern times, the terms base, qualified or determinable fees, are applied to either of the estates above mentioned. Mr. Washburn (1 vol., 77) thinks that the term *determinable fee* is "more generic in its meaning, embracing all fees which are liable to be determined by some act or event expressed on their limitation to circumscribe their continuance or inferred by law as bounding their extent." See, also, 1 Preston Est, 466; Seymour's Case, 10 Rep., 97. The term *qualified fee* is thought to be preferable by Mr. Minor, 2 Inst., 86. By whatever name it may be called, it is plain that except in the case of technical fees conditional at common law, the limitations we have mentioned may still be made when not opposed to public policy. It will be observed that in Kesler's case the decision was made to turn chiefly on the ground

110 — 20

of public policy, and because apt words of limitation were not employed.  In that very decision the existence of a base or qualified fee is recognized in the case of the Cherokee tribe of Indians.  But, however broad may be the language quoted, we have no idea that it was the purpose of the Chief Justice to say that the limitation expressly defined by him as a base or qualified fee in Merrimon's case could not be made in North Carolina.  Such limitations are not infrequent in this and other States (2 Wash. R. P., 4), and we are not prepared to adopt a view which leads to such a revolution in the law of limitations of real property.  We are, therefore, of the opinion that Turner and his heirs took, in equity, an easement to overflow the land of Hall, determinable when they ceased to keep up the said mill.  In this respect it is a limitation.  But it is to be observed that this base, qualified or determinable fee (we prefer the term qualified) is liable to be defeated by the failure of Turner "to allow the said L. W. Hall as much woodland along the line fence on the south side of the river."  In this particular, the estate in the easement is an estate upon condition, and the condition is, in effect, that Hall is to be allowed to use as much land on the south side of the river as is equal to the land which is flooded by the maintenance of the dam at the height of nine feet.  This includes not only the land actually flooded, but all that is damaged and rendered unfit for cultivation by sobbing.  *Cagle* v. *Parker*, 97 N. C., 271.  It seems that soon after the execution of the agreement, Hall was put in possession of about four acres, and continued to occupy it until the death of Turner.  It is insisted that the plaintiffs are restricted to this particular number of acres.  This may be so in some cases, as, for instance, where a right-of-way is granted; if it be once located it cannot be changed.  It may also be true of contracts generally of this character, but we do not think that this particular contract is susceptible of such a construction.  No provision is made for the ascertainment of the land, nor is

there anything to show that the parties intended to fix upon any certain quantity as a final consideration of the easement. Had they so intended, they would doubtless have provided for it in the agreement. The words are strict words of condition, and as applied to this case they constitute a condition subsequent. It was evidently the purpose of the parties that Hall should use as much of Turner's land as would equal the quantity flooded by the dam, and that this agreement was to be carried out in good faith and in view of the exigencies of the future. If the four acres taken possession of by Hall was to be in full satisfaction for the easement, the contract should have so stipulated. The agreement means that so long as Turner, his heirs or assigns, keep up the mill they are entitled to the easement, provided they permit Hall and his heirs or assigns to enjoy an equal quantity of land on the south side of the river. If they refuse to perform this condition, the plaintiffs are entitled to a decree declaring that the easement is at an end. As we have indicated, we think that Hall was not restricted to the four acres, and in this view the third issue (involving an inquiry as to the quantity of land flooded) should have been submitted to the jury. If it should be found that more than the four acres is flooded and sobbed, and thus rendered unfit for cultivation by the maintenance of the dam at the height of nine feet, the defendants must "allow" the plaintiffs the use of an equal quantity of land. It was this uncertain and variable feature of the agreement that seemed at the outset so novel to us, and it is because of this that the plaintiffs pray that the agreement be declared void. As, however, the contract has been executed by the defendants by the erection of permanent improvements, and as it does not contemplate a conveyance of any land, but simply a right to occupy it, we think that it would be inequitable to make such a decree until it is apparent that the defendants are either unwilling, or by their conduct have put it out of their power, to perform the condition. The fact that

the land of Turner has been mortgaged does not of itself work a forfeiture, for this does not happen until there has been an actual disturbance of the possession of the plaintiffs. As to the four acres, the mortgagee is affected with constructive notice of the claim of the plaintiffs, and takes subject to their right to use the same.   If the plaintiffs should be allowed the use of an additional quantity of land, and the mortgagee has had no actual notice, then he would take such additional land free from any claim of the plaintiffs, and if, by reason of such mortgage, the plaintiffs are ousted, there would then be clearly a breach of the condition, and the easement of the defendants, at the election of the plaintiffs, would be forfeited.

If, upon another trial, it be found that more than four acres are flooded and sobbed, then the defendants should submit to the appointment of commissioners to lay off and set apart sufficient land of the defendants for the use of the plaintiffs as will meet the requirements of the contract as interpreted by us.

It is said that there is no allegation that the defendants have declined to allow the plaintiffs the relief we have indicated.   This is a mistake, as the plaintiffs expressly allege that more than four acres have been flooded, and they pray that if the agreement is not declared void, " the quantity of land damaged be ascertained and the same quantity set apart to the plaintiffs south of the river, if said dam shall not exceed the height allowed in the agreement."

The answer, in effect, denies that the plaintiffs are entitled to any larger quantity than the said four acres.

In view of the peculiarity of the case, we are not surprised at the ruling of his Honor, but after much consideration we are of the opinion that, for the reasons given, there should be a new trial.

Error.